BRUSH, RESPONDENT, *v.* CITY OF HELENA, APPELLANT.

(No. 3,845.)

(Submitted December 3, 1917. Decided December 14, 1917.)

[169 Pac. 285.]

*Cities and Towns—Licenses—Illegal Exaction—Recovery Back —Parties in Pari Delicto.*

1. Where city officials, quarterly for some five years, collected a sum of money from a pop-corn vender in such a manner and through such channels as of necessity to advise him that the money paid was the price of immunity from interference with the privilege of keeping his wagon on a street corner in violation of an ordinance, he was *in pari delicto* and not in position to recover back the money so paid.

[As to the rule of *pari delicto*, see note in 113 Am. St. Rep. 724.]

*Appeal from District Court, Lewis and Clark County; J. M. Clements, Judge.*

ACTION by Benjamin L. Brush against the City of Helena. Judgment for plaintiff and defendant appeals. Reversed.

*Mr. Edward Horsky,* for Appellant, submitted a brief and argued the cause orally.

If the transaction here involved was unlawful, plaintiff was *in pari delicto,* and the court will leave him where it finds him. (*Glass* v. *Basin & Bay State Min. Co.,* 31 Mont. 21, 33, 77 Pac. 302; *City of Philipsburg* v. *Degenhart,* 30 Mont. 299, 305, 76 Pac. 694; 9 Cyc. 546.) After he kept this up for five years, paying quarterly, and after he had received and enjoyed the privilege, it does not lie in his mouth to claim he was defrauded.

Money illegally and erroneously collected for licenses cannot be recovered back if voluntarily paid and not for or on account of any property taxes assessed. (*O'Brien* v. *Colusa County,* 67 Cal. 503, 8 Pac. 37.) One cannot recover back from a city money paid for a license which the city had no power to require, the city officials having asserted that they had the power, and the money being paid in consequence of such assertion. (*Holder* v. *City of Galena,* 19 Ill. App. 409.)

Payment of a license fee by a hackman, upon a threat to stop his hack, without objection except as to the amount, is voluntary, and no recovery can be had, though the tax was illegal. (*City of Jackson* v. *Newman,* 59 Miss. 385, 42 Am. Rep. 367.) Threat of legal process is not duress, for the party may plead and make proof, and show that he is not liable. Where the collector demanded of the defendants the amount of the license tax due by them as merchants, and threatened a prosecution therefor, and the defendants paid under protest, it was held that the payment was not under duress. (*Claflin* v. *McDonough,* 33 Mo. 412, 84 Am. Dec. 54; *Irving* v. *St. Louis County,* 33 Mo. 575; *Maxwell* v. *San Luis Obispo County,* 71 Cal. 466, 12 Pac. 484; *City of Savannah* v. *Feeley,* 66 Ga. 31.) A person who has paid money for a license as a wagoner under protest, but with no mistake of fact, cannot recover it back. (*Cook* v. *City of Boston,* 9 Allen (91 Mass.), 393.) If one pay willingly, though irregularly and without obligation, it may not be recovered back. (*Union & Planters' Bank* v. *City of Memphis,* 107 Tenn. 66, 64 S. W. 13.) "A mere threat to begin action for the collection of a penalty for failure to pay a license fee does not render a payment of such fee under protest an involuntary payment." (*Southern Ry. Co.* v. *Mayor etc. of City of Florence,* 141 Ala. 493, 3 Ann. Cas. 106, 37 South. 844.) Where a license has been paid for and enjoyed, the money given therefor cannot be recovered back although imposed without authority. (*Washington* v. *Barber,* Fed. Cas. No. 17,224.)

Plaintiff admits: (a) That he was violating the law; (b) that to avoid being arrested, he paid the money; and was thus either stifling prosecution or defeating regular proceedings in a court of justice. Such transaction was clearly contrary to public policy and void. (*Johnson* v. *Douglas,* 32 Wash. 293, 73 Pac. 374; 9 Cyc. 546.)

Plaintiff violated the ordinances. According to his own statement, he paid the sum voluntarily from time to time to certain officers of the city. Under such state of facts, plaintiff has no cause of action which he can maintain to recover back

the amounts so paid. (4 Dillon on Municipal Corporations, secs. 1621–1623.)

"The courts even go so far as to hold that money collected from individuals by a city or its officials under a threat to use legal remedies to collect the same does not make such payment compulsory in law." (*Taylor* v. *Philadelphia Board of Health,* 31 Pa. St. 73, 72 Am. Dec. 724.)

*Messrs. E. A. & F. E. Carleton,* for Respondent, submitted a brief; *Mr. F. E. Carleton* argued the cause orally.

Counsel contends that if the transaction was unlawful, plaintiff was *in pari delicto,* and the court will leave him where it finds him, and 9 Cyc. 546 is cited. As this text points out, there are numerous exceptions to the rule. (Pages 551, 552.) There is no testimony in the record that respondent was aware that he was violating any law or ordinance or doing anything that was improper. He trusted everything to the city and its officials. Therefore the doctrine does not apply. We concede the rule to be that where the parties stand on an equal footing and the transaction is perfectly open and above board, and both parties to the contract fully understand, know and appreciate that the contract which they have entered into is against public policy and void, and knowing this they enter into it, no recovery can be had by one for a breach of the contract by the other. In such cases the doctrine of *in pari delicto* applies. But that is not the case at bar. This peanut vender knew nothing about the legal rights of the city or even of his own with reference to the matter, and was entitled to assume that the city knew what it was doing and had the power to act as it did. The parties here did not stand on an equal footing and the doctrine does not apply. (*Callaway* v. *Milledgeville,* 48 Ga. 309; *Bruner* v. *Town of Stanton,* 102 Ky. 459, 43 S. W. 411; *Bergmeyer* v. *Greenup County* (Ky.), 44 S. W. 82; *Jackson* v. *Newman,* 59 Miss. 385, 42 Am. Rep. 367; *Drew County* v. *Bennett,* 43 Ark. 364; *Catoir* v. *Watterson,* 38 Ohio St. 319; *Shelton* v. *Silver Field,* 104 Tenn. 67, 56 S. W. 1023.) The ques-

tion now before this court came squarely before the Colorado court of appeals in 1898 in the case of *Walsh* v. *City of Denver,* 11 Colo. App. 523, 53 Pac. 458. There it was held that the payment of a license fee exacted by a void ordinance is involuntary and may be recovered back from the city. (See, also, *City of Chicago* v. *Sperbeck,* 69 Ill. App. 562; *Douglas* v. *Kansas City,* 147 Mo. 428, 48 S. W. 851; *City of Toledo* v. *Buecele,* 19 Ohio C. C. 127; *Mayor* v. *Radeclese,* 49 Md. 226; *State* v. *Dering,* 84 Wis. 585, 36 Am. St. Rep. 948, 19 L. R. A. 858, 54 N. W. 1104; *City of Jacksonville* v. *Ledwith,* 26 Fla. 163, 23 Am. St. Rep. 558, 9 L. R. A. 69, 7 South. 885; *McGregor* v. *Village of Lovington,* 48 Ill. App. 211; 30 Cyc. 1303.)

"The payment of an illegal tax to a municipal corporation under any circumstances which, in theory of law constitutes it an involuntary payment, may be recovered by ordinary action." (6 McQuillin on Municipal Corporations, sec. 2507; *Douglas* v. *Kansas City, Leonard* v. *City of Canton, supra.*)

MR. JUSTICE SANNER delivered the opinion of the court.

Action to recover $1,700 paid to the city of Helena under the circumstances hereinafter stated. Plaintiff had a verdict for $1,175 and judgment accordingly. From that judgment the city appeals, and it also asserts an appeal from an order entered in the district court denying it a new trial.

The asserted appeal from the order is without validity, because not taken in time. The appeal actually here is from the judgment only; and, as the fundamental and, in our opinion, decisive proposition thus presented is whether there is any evidence to support the verdict and judgment, we deem it unnecessary to consider the many other questions which the industry of counsel has submitted.

The case made by the plaintiff, respondent here, is this: In July, 1908, he desired to go into business at Helena selling popcorn, peanuts, chewing-gum, and other trifles and bought a suitable wagon for that purpose; he wished to locate himself and his wagon upon the public street at the American National

Bank corner of Sixth and Main; he applied to the city treasurer for a license, was told there was none, to go ahead; he started at the location he had selected, but after twenty days was stopped by the chief of police; he then made application in writing to the city council "for a license or the privilege," which application was presented and refused; he then went to Mayor Edwards, who promised to see what could be done; two weeks later he was told by the chief of police that an arrangement had been made to let him operate on the street, and was directed to report next day at the office of the chief; he reported, and the chief said "what the tax would be," to-wit, $100 per quarter, the desired location being designated; he then accompanied the chief to the police court, where the chief told the police judge, "This man pays $100"; he made a check payable to the police judge for $100 and thereafter quarterly made similar checks, except that after the first four the checks were made to the chief of police, until December, 1912, when the quarterly amount paid was $50, until he quit in October, 1913; he paid in all $1,700. He was never before the police court but the one time, nor served with nor shown any papers in connection with the matter, but "paid to get off from being arrested"; it was "made plain" to him that he "had to pay or get off the street or be arrested," and he paid to avoid the alternative; he "supposed the authorities had the right to demand the money, and paid it to the chief of police with that understanding"; he never knew the contrary until September, 1913, a month before he quit. Touching the reduction he says: "I had hunted up the members of the council and the mayor and asked them for a reduction; * * * but the mayor usually thought it was cheap enough. * * * Later some of the council thought it was pretty steep; * * * I told them I could not stand the price, and if they did not reduce it I would get off; * * * they reduced it to $50." On cross-examination he says his wagon was at the location desired every afternoon and evening from July, 1908, to October, 1913, that he did not know that he was there contrary to any ordinance,

but supposed he was rightfully there, and that he sought a permit in the first instance because he knew he would have to have a permit of some kind and wanted to get along with the city.

It is beyond doubt that we have here one of those left-handed [1] transactions in which city officials too often indulge, and which bear upon their face the stamp of irregularity, carrying to every mind, particularly to the participants, the knowledge that something is wrong. In view of this and of the facts that the plaintiff had started without leave and been stopped by the chief of police, had then sought and been denied a permit by the council, had thereafter secured an "arrangement" which was inaugurated in the police court and transacted through the police office, he cannot plead total ignorance or innocence, or assert, as he does, that he was wholly misled and deceived by misrepresentations or false claims of rightful authority upon the part of the city officials.

These inferences the evidence on the part of the city but serves to emphasize; for, instead of aiding the plaintiff, it tends to show that his location at the coveted point was the result of an "arrangement" between him and the mayor; that this arrangement was made after he had been told of ordinances which forbade him to keep a wagon on the streets, prevented the granting of any such license or permit as he desired; and that the arrangement required him to make the quarterly payments in such a way that they were obviously the price of immunity from interference.

Now, the city got all the money the plaintiff paid; and either it had or it had not the right to permit him for a price to occupy, and therefore obstruct, the street with his wagon. If the city had that right, and the method only was irregular, the plaintiff has no complaint even on his own theory. If the city had not the right, then the wrong done was against the public, against others, not the plaintiff. He still got what he bargained for—the enjoyment of the desired location for over five years, undisturbed by interference on the part of the city.

What he sought was immunity, and it was granted. If it was unlawfully granted, he was *in pari delicto,* and the law will not aid him to recover back the money which, so far as he is concerned, represents value received. "*In pari delicto, potior est conditio defendentis.*"

On any theory, therefore, the plaintiff is not entitled to recover upon the evidence presented; in other words, the judgment stands unsupported by evidence.

It is therefore reversed, with directions to dismiss the action.

*Reversed and remanded.*

Mr. Chief Justice Brantly and Mr. Justice Holloway concur.

(Submitted December 3, 1917.  Decided December 17, 1917.)